1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

CANDIDA ROSE GUTIERREZ,

      Plaintiff,

vs.

MICHAEL J. ASTRUE, Commissioner of
Social Security,

      Defendant.
_____/

No. C 12-1390 MEJ

**ORDER RE: CROSS-MOTIONS FOR
SUMMARY JUDGMENT**

### INTRODUCTION

Plaintiff Candida Rose Gutierrez ("Plaintiff") brings this action pursuant to 42 U.S.C. §
405(g), seeking judicial review of the decision of the Commissioner of Social Security, Defendant
Michael J. Astrue, denying Plaintiff's claim for disability benefits.  Pending before the Court are the
parties' cross-motions for summary judgment.  (Dkt. Nos. 10, 15.)  Pursuant to Civil Local Rule 16-
5, the motions have been submitted on the papers without oral argument.  Having carefully reviewed
the parties' papers, the administrative record ("AR"), and relevant legal authority, the Court hereby
GRANTS Plaintiff's motion for Remand and DENIES Defendant's cross-motion for summary
judgment for the reasons set forth below.

### BACKGROUND

Plaintiff was born on November 2, 1951.  (AR 277.)  At the time of her hearing before the
Administrative Law Judge, Plaintiff was 58 years old, had been married for 38 years, and lived with
her husband.  (AR 512.)

1  Plaintiff received her GED in 1975 and has taken some clerical courses.  (AR 33, 146.)  She

2  worked as an underwriting assistant from 1978 to 1990, and as a secretary from 1992 to 2002.  (AR

3  156.)  On March 4, 2002, Plaintiff was laid off because the company closed. (AR 40.)  At the time

4  she filed for disability in 2008, Plaintiff was occasionally working as an Avon Representative selling

5  beauty products.  (AR 156.)

6  Plaintiff claims that she is disabled because of carpal tunnel syndrome, tendonitis in the arms

7  and wrists, and depression.  (AR 41-45, 141, 169.)

8  **A.    Physical Impairments**

9  Plaintiff's medical evidence in support of her claim dates back to January 1998.  (AR 196-

10  512.)  The record indicates that Plaintiff's physical impairments stem from a work-related injury as a

11  secretary in 1995.  (AR 232, 239.)  At that time, Plaintiff suffered a repetitive strain injury as a result

12  of extensive computer use in her job.  (AR 232, 239-55.)  From 1995 until 2001, she was treated by

13  various physicians and physical therapists with medication, physical and occupational hand therapy,

14  corticosteroid injections and bracing.  (AR 239-41, 343-58, 375-85.)  Robert Minkowsky, M.D., a

15  physiatrist/rehabilitation physician, began treating Plaintiff in 1997.  He opined that between 1997

16  and 2001, Plaintiff's condition was improving, but slower than expected due to an increased

17  workload at her job.  (AR 239-41, 343-58.)

18  In June 2001, Plaintiff complained to Dr. Minkowsky that she had increased pain over her

19  right shoulder.  (AR 234.)  Dr. Minkowsky examined Plaintiff on September 12, 2001, and opined

20  that she had a flare-up of her repetitive strain injury with right shoulder tendinitis resulting from

21  excessive use of a trackball and a mouse.  (AR 234, 270, 373.)  He prescribed physical therapy.  (AR

22  234, 373.)  Although her shoulder symptoms improved with physical therapy, they did not fully

23  resolve.  (AR 234.)  Dr. Minkowsky thus referred her to Jeffrey Halbrecht, M.D., a board certified

24  orthopedic surgeon.  (AR 234, Pl.'s Mot. at Exh. A.)

25  On March 26, 2002, Dr. Halbrecht examined Plaintiff.  (AR 331-33.)  Dr. Halbrecht

26  diagnosed rotator cuff impingement syndrome and AC joint inflammation.  (AR 332.)  He

27  administered a cortisone shot in the subacromial space and opined that if Plaintiff were working, her

28

United States District Court
For the Northern District of California

1  restrictions would include no over shoulder reaching or lifting and no repetitive use of the mouse.

2  (AR 331-32.)  Dr. Minkowsky and Dr. Halbrecht opined that Plaintiff improved after the injection.

3  (AR 234, 332.)

4  On May 24, 2002, Leonard Gordon, M.D., a Qualified Medical Evaluator[1], examined

5  Plaintiff for the purpose of a comprehensive orthopedic hand surgery medical-legal evaluation.  Dr.

6  Gordon examined her right and left upper extremities, but noted that her shoulder issue was outside

7  of his expertise.  (AR 270-74.)  He opined that Plaintiff had a migratory cumulative trauma problem

8  and that there were several areas of pain and discomfort in the extremities.  (AR 274.)  Dr. Gordon

9  recommended treatment with anti-inflammatories, analgesics, and wrist splinting, but no invasive

10  treatment.  (AR 275.)  He also recommended that Plaintiff receive advice regarding hand use and

11  ergonomics.  (AR 275.)

12  On June 11, 2002, Dr. Minkowsky completed a medical detail report at the request of the

13  California Employment Development Department, Disability Insurance ("EDD").  (AR 325-26.)  In

14  his report, Dr. Minkowsky noted Plaintiff had a moderate to severe strain injury involving the

15  shoulders, hands, arms, and wrist.  (AR 326.)  He estimated that Plaintiff could return to work on

16  September 1, 2002.  (AR 325-26.)

17  On December 3, 2002, Eugene A. Baciocco, M.D., examined Plaintiff for the purpose of an

18  Orthopedic Medical Evaluation of her right upper extremity and cervical spine.  (AR 265.)  In his

19  evaluation, Dr. Baciocco questioned the validity of her workers' compensation claim because

20  Plaintiff did not make the claim until after she was laid off.  (AR 264.)  He found no objective

21  factors of permanent disability to assess, and described her subjective factors of permanent disability

22  as minimal to slight pain.  (AR 265.)  Dr. Baciocco opined that Plaintiff was not disabled, had no

23  actual work limitations and did not need any further treatment beyond over-the-counter anti-

24

25  [1]A Qualified Medical Evaluator is a physician licensed by the appropriate licensing body for the
26  State of California and appointed pursuant to California Labor Code Section 139.2. Cal. Code Regs.,
    tit. 8, § 1(t).

27

28

1   inflammatory drugs.  (AR 265.)  Dr. Baciocco noted that he had not reviewed any medical records

2   prior to examining Plaintiff.  (AR 261.)  However, Dr. Baciocco subsequently reviewed Plaintiff's

3   medical records on February 10, 2003, and did not change his conclusion.  (AR 244.)

4         On February 24, 2003, Dr. Minkowsky examined Plaintiff and completed a Supplemental

5   Certification at the request of the EDD regarding Plaintiff's condition.  (AR 283-85.)  He noted that

6   Plaintiff was having problems with her shoulder and that she had fallen and injured her tailbone.

7   (AR 285.)  Dr. Minkowsky reported that Plaintiff continued to suffer from repetitive strain injury.

8   (AR 283.)  He also reported that Plaintiff's condition prevented her from returning to work due to its

9   severity and Plaintiff's difficulties with activities of daily life.  (AR 283.)  He estimated that Plaintiff

10  could return to work on January 1, 2004.  (AR 284.)

11        On March 27, 2003, Dr. Minkowsky completed a further examination.  Plaintiff complained

12  that stirring, cooking, and chopping produced pain in the right wrist and hand, and that lifting

13  laundry and cleaning the house also produced pain.  (AR 234.)  Plaintiff also complained that she

14  had weakness in the right hand and carried groceries with her left arm as carrying them on the right

15  arm produced pain.  (AR 235.)  Plaintiff also informed Dr. Minkowsky that she tried entering data

16  for a family member for five hours a day for two days, but had to stop after two days because of pain

17  in the upper right arm.  (AR 235.)  In an April 1, 2003 report, Dr. Minkowsky opined that Plaintiff's

18  injuries were related to her 1995 injury.  (AR 235.)  He concluded that Plaintiff was precluded from

19  over the shoulder reaching; lifting; repetitive use of the mouse; writing and computer use of more

20  than two hours in an eight-hour day; repetitive pushing or pulling; forceful reaching, pushing and

21  pulling; repetitive gripping; strenuous gripping; and heavy use of the arm even occasionally.  (AR

22  236.)  As to future medical treatment, Dr. Minkowsky opined that it would only be necessary if she

23  experienced flare-ups of her symptoms.  (AR 236.)  If flare-ups occurred, she would need physical

24  therapy, monitoring by a treating physician, and perhaps anti-inflammatory medication on an

25  intermittent basis.  (AR 236.)

26        On May 15, 2003, Dr. Minkowsky examined Plaintiff and reported to California's Division

27  of Workers' Compensation Division ("DWC") that her muscle strength was improving.  (AR 362.)

28

United States District Court
For the Northern District of California

1    He examined her again on June 26, 2003 and reported to the DWC that Plaintiff had less pain in her

2    arms.  (AR 361.)  On July 25, 2003, Dr. Minkowsky examined Plaintiff and reported to DWC that

3    Plaintiff was doing well overall, but experiencing intermittent arm pain.  (AR 360.)  He also noted

4    that she was interviewing for a job with Avon and that she may have to occasionally lift 20 pounds.

5    (AR 229.)

6         On September 12, 2003, Dr. Minkowsky examined Plaintiff and noted that she was doing

7    well and that she was undergoing endoscopy for gastritis.  (AR 228.)

8         On October 7, 2003, Dominic Tse, M.D., completed an orthopedic evaluation.  (AR 238-57.)

9    Dr. Tse reviewed Plaintiff's medical records from 1995 until June 2003 and noted that "there have

10   been many consultants and treating physicians in the past with diverging opinions."  (AR 238-46.)

11   He diagnosed repetitive strain injury affecting Plaintiff's upper extremities, predominantly right

12   dominant side.  (AR 253.)  Dr. Tse found chronic postural cervical strain present, with mild

13   underlying degenerative arthropathy and disk disease of the lower cervical spine.  Dr. Tse noted,

14   > [L]ingering symptoms are anticipated, being persistent, even though the patient is no
> longer working, no longer involved in computer work.  Her condition . . . remains
15   > vulnerable, still with persistence of physical impairment, even in activities of daily
> living, but more manageable . . . [T]he persistent neck discomfort is related to her
16   > arthritis, the same for the lower back, having a low grade intermittent lumbar strain . . .
> Subjectively, her neck and upper extremity pain, right more than the left, has been
17   > frequent and slight, intermittently moderate with any sustained computer use, typing or
> pointing device.  Low back pain was intermittent and slight.  Objectively, the neck is
18   > tender to palpitation, with radiological findings of loss of the usual cervical lordotic
> curvature and mild facet arthropathy.

19

20   (AR 253.)  Dr. Tse precluded Plaintiff from any forceful or repetitive activities, including

21   lifting, pushing, pulling, grasping, torquing, holding, or similar activities of comparable

22   physical effort.  (AR 253.)  He also precluded her from over the shoulder reaching and from

23   repetitive motion or prolonged static posture of the neck.  (AR 253.)  He noted that all of the

24   affected areas remained vulnerable to flare-ups and that there was no cure for her condition.

25   (AR 254.)

26        On January 22, 2004, Dr. Minkowsky examined Plaintiff and reported to the DWC that she

27   was working part-time, but the work did not involve using a computer.  (AR 359.)  He also noted

28

United States District Court
For the Northern District of California

1  that Plaintiff was being trained for Avon and would make phone calls only with a headset.  (AR

2  227.)  After January 24, 2004, Dr. Minkowsky did not see Plaintiff again until March 2008.

3        On March 19, 2008, Dr. Minkowsky examined Plaintiff, at which time she complained that

4  she was experiencing pain in her right shoulder, elbow, and wrist, which made it difficult to use the

5  computer.  (AR 226.)  Plaintiff also stated that her wrist was swelling, and she was using a

6  transcutaneous electrical nerve stimulation ("TENS") machine sometimes for pain relief.  (AR 226.)

7  Plaintiff was also experiencing pain in her right hand and was having difficulty straightening out her

8  fingers.  (AR 226.)  At the same time, she was experiencing right-hand weakness and gave the

9  example of not being able to open a water bottle.  (AR 226.)  Dr. Minkowsky measured Plaintiff's

10 grip strength and noted 18-8 in the right hand and 22-22 using the left.  (AR 226.)  He also noted

11 that Plaintiff had severe adverse neural tension on the right and mild to moderate on the left.  (AR

12 226.)  He repeated his previous diagnosis of repetitive strain injury and cervicothoracic strain and

13 dysfunction.  Dr. Minkowsky noted that Plaintiff was unable to use the computer to the extent that

14 she was using it.  (AR 226.)

15       On July 14, 2008, Dr. Minkowsky completed a medical source statement.  (AR 386-87.)  He

16 assessed Plaintiff as having moderately severe chronic pain and functional limitations.  (AR 386.)

17 He indicated that Plaintiff was precluded from lifting and/or carrying more than 10 pounds both

18 occasionally or frequently, and that she could stand, walk, and/or sit about six hours in an eight-hour

19 work day.  (AR 386.)  Dr. Minkowsky also stated that Plaintiff was using a TENS unit to diminish

20 the pain and a wrist brace to support her hand.  (AR 386.)  He stated that Plaintiff should never

21 climb, balance, kneel, crouch, or crawl.  (AR 387.)  Dr. Minkowsky limited Plaintiff to: occasional

22 stooping, reaching, handling, and fingering, but no more than 25% of the time.  (AR 387.)  In

23 addition, Dr. Minkowsky restricted Plaintiff to: no over the shoulder reaching or lifting; no

24 cumulative writing or computer use – maximum two hours in an 8-hour day; no repetitive pushing or

25 pulling; no forceful reaching, pushing or pulling; no repetitive gripping; and no strenuous gripping.

26 (AR 387.)  He also precluded Plaintiff from heavy use of the arm (even occasionally), from moving

27 machinery, and from working in temperature extremes.  (AR 387.)

28

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1    On August 1, 2008, Calvin Pon, M.D., examined Plaintiff for a Consultative Orthopedic

2   Disability evaluation at the request of the Social Security Administration ("SSA").  (AR 388.)  At

3   this evaluation, Plaintiff reported that her sitting tolerance was approximately three hours and her

4   standing tolerance was a "couple of hours."  Plaintiff told Dr. Pon that she: was able to walk up and

5   down stairs with no assistance; was an independent dresser; cooked and prepared her own meals; fed

6   herself; washed dishes, vacuumed; and that she drove.  (AR 388.).  Plaintiff also told Dr. Pon that

7   she did not take out garbage, sweep, mop, or do laundry.  (AR 388.)  Plaintiff stated that she was not

8   working at the time because of her symptoms.  (AR 389.)  Upon examination, Dr. Pon found that

9   Plaintiff had a normal gait and upon palpitation, and that she complained of tenderness in the

10   shoulders and wrists.  (AR 389.)  He also found that Plaintiff was able to pick up coins with both

11   hands and write legibly.  (AR 389.)  Dr. Pon diagnosed Plaintiff with chronic right shoulder pain

12   with possible bursitis; rotator cuff tendonitis and/or tear; chronic bilateral wrist pain with tendonitis;

13   chronic low back pain with possible lumbar disk disease; and possible degenerative changes.  (AR

14   390.)  Dr. Pon described her functional capacity as:

15           [A]ble to stand and walk for a total of six hours in an eight-hour workday.  She should
         be able to sit for a total of six hours during and an eight-hour workday.  Stooping
16        should be limited to occasionally.  Crouching, kneeling and squatting should be limited
         to occasionally.  There is no restriction in climbing stairs.  Climbing ladders and
17        crawling should be limited to occasionally.  In spite of her complaint of bilateral
         shoulder pain, she should still be able to  perform bilateral pushing and pulling
18        arm/hand control on a frequent basis.  There is no restriction in performing bilateral
         pushing leg/foot control.  She should be able to lift and carry ten pounds frequently and
19        occasionally 20 pounds.  Reaching bilaterally should be limited to occasionally.  There
         is no limitation in her ability to perform fine manipulative tasks with both hands.  There
20        is no functional impairment in her ability to perform gross manipulative tasks with both
         hands.  However, there might be some symptomatic limitations because of her
21        complaints of bilateral wrist pain.

22   (AR 390.)

23           On September 3, 2008, S. Mathur, M.D. completed a Case Analysis (Form SSA-416)

24   and Residual Function Capacity Assessment (Form SSA-4734).  (AR 397.)  He reviewed the

25   SSA's case file from 2006, which included exams from December 3, 2002, March 27, 2003,

26   and a neurological consult dated July 17, 2006.  (AR 397.)  He also reviewed Dr.

27   Minkowsky's March 26, 2002 and July 14, 2008 evaluations; Dr. Kamal Shamash's December

28

22, 2007 evaluation; a lab report dated January 8, 2008; and Dr. Pon's evaluation dated August 1, 2008.  (AR 398.)  He opined that Dr. Minkowsky gave a very restricted medical source statement, which was inconsistent with objective findings, and that Dr. Minkowsky failed to provide any indication or explanation for postural limitations.  (AR 398-99.)  Dr. Mathur opined that based on objective findings, a light RFC with manipulative limitations was appropriate.  (AR 399.)  Specifically, Dr. Mathur found that Plaintiff's exertional limitations were occasionally lifting 20 pounds and frequently lifting 10 pounds; standing, walking, and/or sitting six hours in an 8-hour day; and unlimited pushing and pulling.  (AR 393.)  He reported no postural limitations, but noted that a  Cotrel-Dubousset instrumentation of Plaintiff's lumbar spine was needed.  He found that Plaintiff's reaching was limited in all directions, including overhead.  (AR 394.)  Dr. Mathur found no visual, communicative, or environmental limitations.  (AR 394-95.)

On January 30, 2009, Sadda V. Reddy, M.D., completed a Case Analysis for the SSA. (AR 482-83.)  Dr. Reddy reviewed Dr. Mathur's Case Analysis and RFC, as well as Dr. Minkowsky's July 14, 2008 medical source opinion.  (AR 482.)  Dr. Reddy also reviewed a report dated November 8, 2008, but found it difficult to read.  (AR 482.)  Dr. Reddy agreed with Dr. Mathur and affirmed that a light RFC was more consistent with objective findings, and that Dr. Mathur's prior RFC determination of light with occasional overhead reaching was appropriate.  (AR 482.)

On June 30, 2009, Christopher J. Yoo, M.D., reviewed Plaintiff's Cotrel-Dubousset instrumentation of the lumbar spine and found multilevel mild degenerative disc disease throughout the lumbar spine, retrolisthesis of L3 on 4, and degenerative joint disease of the sacroiliac joints. (AR 501.)

On September 9, 2009, Dr. Minkowsky again examined Plaintiff.  At the time, Plaintiff complained that she was having pain in her right shoulder, hands and arms.  (AR 510.)  She was also wearing a wrist brace.  Dr. Minkowsky noted that there was no change in Plaintiff's ability to work, and that her restrictions remained the same as in his March 19, 2008 report.  (AR 510.)  In that

1   report, Dr. Minkowsky stated that Plaintiff was unable to use a computer, and was therefore unable

2   to work.  (AR 226.)

3   **B.      Mental Impairment**

4          Plaintiff initially complained to Dr. Minkowsky about depression on May 15, 2003, when

5   she stated that she was depressed because she could not work and she had to do an exercise

6   program.  (AR 362.)  She agreed to talk with her primary care physician regarding antidepressants.

7   (AR 362.)  On June 26, 2003, Dr. Minkowsky noted that Plaintiff was in better spirits.  (AR 230.)

8   There is nothing in the record regarding Plaintiff's depression again until 2008.

9          On October 29, 2008, Kamal Shamash, M.D., Plaintiff's primary care physician, examined

10  Plaintiff for her depression.  (AR 487.)  He initially prescribed Lexapro, but changed the

11  prescription to Zoloft at Plaintiff's request because the cost of Lexapro was too high.  (AR 487.)

12  Dr. Shamash examined Plaintiff again on October 7, 2009 and advised her to see a psychiatrist.

13  (AR 485.)

14         On December 21, 2009, Les Kalman, M.D., PSY.D., M.F.C.C., DABFM, completed a

15  psychiatric evaluation of Plaintiff.  (AR 505-08.)  Mentally, Dr. Kalman found Plaintiff to be

16  pleasant, cooperative, alert, depressed, logical, goal-oriented, and oriented to person, place, date

17  and situation, with no hallucinations or delusions.  (AR 507.)  Dr. Kalman described her affected

18  status as restricted with vegetative signs including insomnia alternating with hypersomnia,

19  anhedonia, decreased energy level, and feelings of worthlessness, helplessness, and hopelessness.

20  (AR 507.)  Plaintiff told Dr. Kalman that she could cook, shop, do some housekeeping, and attend

21  to her own personal hygiene.  (AR 508.)  Plaintiff also stated that she managed her own

22  transportation and finances.  (AR 508.)  Plaintiff told Dr. Kalman that she got along with her family

23  and she self-isolated from others.  (AR 508.)  Dr. Kalman opined that Plaintiff was presenting signs

24  and symptoms of depression stemming from life circumstances; specifically, physical debility and

25  subsequent financial stressors.  (AR 508.)  He diagnosed her with adjustment disorder secondary to

26  general medical condition.  (AR 508.)  Dr. Kalman also assessed her Global Assessment of

27  Functioning (GAF) to be at 50.  (AR 508.)  A GAF score reflects "the clinician's judgment of the

28

*United States District Court*
For the Northern District of California

United States District Court
For the Northern District of California

1  individual's overall level of functioning" regarding only psychological, social and occupational

2  functioning, and not considering physical or environmental limitations.  Am. Psych. Ass'n.,

3  Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. (Text Revision) 2000).  A GAF

4  of 50 indicates Plaintiff exhibits "serious symptoms (e.g., suicidal ideation, severe obsessional

5  rituals, frequent shoplifting) or any serious impairment in social, occupational, or school

6  functioning (e.g., no friends, unable to keep a job)."  *Id*. at 34.  Dr. Kalman opined that Plaintiff's

7  depression was not expected to improve significantly in the following twelve months unless her

8  physical debility improved.  (AR 508.)

9  **C.      Procedural Background and SSA Proceedings**

10         On June 17, 2008, Plaintiff filed a Title II application for social security benefits, alleging

11  disability beginning March 4, 2002.  (AR 120-23.)[2]  The application was denied initially on

12  September 12, 2008, and upon reconsideration on February 2, 2009.  (AR 78-87.)  Plaintiff

13  thereafter filed a written request for a hearing on May 6, 2009.  (AR 152.)

14         Administrative Law Judge ("ALJ") Benjamin F. Parks conducted a hearing on January 7,

15  2010.  (AR 30-59.)  Plaintiff appeared at the hearing with her attorney, Geri N. Kahn.  The ALJ

16  heard testimony from Plaintiff and Vocational Expert Robert A. Raschke, M.A.  (AR 18.)

17         1.      Plaintiff's Testimony

18         Plaintiff testified that she has carpal tunnel and tendonitis in both hands.  (AR 35.)  She

19  stated that she is right-handed and mostly affected in her right hand.  (AR 35.)  She testified that

20  she had tingling in her right hand and pain in her palm, elbow, and shoulder.  (AR 36.)  Plaintiff

21  also said that she had wrist pain that travels from her hands to her wrists.  (AR 37.)  She testified

22  that the pain subsided when she stopped being a secretary, but it would come back when she started

23  using her hands.  (AR 37.)  She recalled taking x-rays, but had not had an EMG with needles and

24  nerve conduction.  (AR 39.)  Plaintiff testified that she was being treated by Dr. Minkowsky with

25

26  [2]The record indicates that Plaintiff filed two prior unsuccessful disability claims in 2003 and
2006 using the same injury onset date.  (AR 126.)  The 2003 claim was denied because insufficient
27  evidence was furnished.  (AR 126-27.)  The 2006 claim was denied because of Plaintiff's capacity for
substantial gainful activity.  (AR 126-27.)

28

United States District Court
For the Northern District of California

1    cortisone shots, physical therapy, and pain medication.  (AR 38.)  She also stated that she was

2    stretching and using a TENS machine on her hands, shoulder, and forearm to minimize the pain.

3    (AR 45.)  She testified that a massage or warm shower helped her pain.  (AR 46.)  Plaintiff also

4    testified that she was taking extra-strength Tylenol and Advil for her pain, and an antidepressant for

5    her depression.  (AR 41-42.)  She stated that she had stopped taking the antidepressant in early

6    2009, but started taking them again in September or October, and the antidepressants were helping.

7    (AR 41-43.)  She stated that she had been referred to a psychologist or psychiatrist, but her

8    husband's insurance coverage was limited and she could not afford to go.  (AR 46.)

9          Plaintiff testified that the depression affected her daily activities because she did not want to

10   go out of the house, she was irritable and impatient, would cry for no reason, and she did not want

11   to do anything.  (AR 43.)  On a typical day, she testified that she got up between 7:00 and 7:30

12   a.m., completed her bible study homework, and then made phone calls.  (AR 44.)  She stated that

13   she had breakfast around 10 or 11, then she did either housework, returned phone calls, or watched

14   movies on the television.  (AR 44.)  She testified that her mom, aunt, and husband helped her with

15   the shopping, cooking, and cleaning, but they did most of the housework.  (AR 44.)  She also

16   testified that she went to bed after the news around 10:00 p.m. or 11:00 p.m., but sometimes she did

17   not sleep through the night.  (AR 44-45.)

18         Plaintiff testified that she was a secretary for an insurance company from 1992 until 2002,

19   and an underwriting assistant prior to being a secretary.  (AR 35.)  She stated that she was laid off

20   in 2002 because the company closed.  (AR 40.)  She testified that she filed a workers' compensation

21   claim for her injuries and received $70,000, but no additional vocational rehabilitation.  (AR 40.)

22   At the time of the hearing, she stated that she was making $200 to $300 per month from selling

23   Avon.  (AR 34.)  She testified that she did not type very much at the insurance company, but an

24   Avon order takes 1 to 15 minutes to enter into the computer.  (AR 34, 36.)  Plaintiff testified that

25   since she started working for Avon, she had developed back pain and varicose veins.  (AR 46.)  She

26   stated that she experienced the pain when walking too long, going up and down stairs, or sitting 2-3

27   hours, and that it was difficult for her to get up from sitting.  (AR 46.)  She testified that Dr.

28

1    Shamash told her that her back pain was due to arthritis, and that she alleviated the pain by using a

2    heating pad on her back, with doses of Tylenol and Advil helping as well. (AR 47.)

3         2.    Mr. Raschke's Testimony

4    Mr. Raschke appeared by phone as the vocational expert. (AR 47.) He testified that

5    Plaintiff's work as a secretary was a skilled level six sedentary job, and the Avon job was best

6    described as telephone sales, a skilled level 3 sedentary job. (AR 48.) Mr. Raschke stated that he

7    did not know if the Avon job was significant gainful employment based on her earnings report.

8    (AR 48.) He also testified that Plaintiff was unable to perform relevant work. (AR 25.)

9         Next, the ALJ proposed the first hypothetical: whether there were any jobs in the regional or

10   national economy, extertionally light, for a person at Plaintiff's age based on the onset of her

11   condition, between ages 50 and 55, that could have occasional use of hands (occasional gross

12   handling, reaching and pulling). (AR 48.) In response, Mr. Raschke answered yes, there would be

13   jobs that could have occasional use of hands. (AR 49.) He testified that there were unskilled jobs

14   that existed in significant numbers that Plaintiff had the RFC to perform, including Gate Guard,

15   Dictionary of Occupational Titles ("DOT")[3] code 372.667-030 (level 3, light - 5,000 regional,

16   375,000 nationally) and usher, DOT code 344.677-014 (level 2, light - 700 regional, 35,000

17   nationally). (AR 48-49.)

18        The ALJ proposed a second hypothetical: whether there were any jobs in the regional or

19   national economy, extertionally light, with occasional use of hands, for a person between ages 50

20   and 55 that with a mental RFC of mild for activities of daily living, mild for social function,

21   moderately impaired for concentration, persistence and pace, 40 to 50% for detailed and complex

22   instructions, as well as 40 to 50% for simple and repetitive instructions and no episode of

23   decompensation. (AR 50.) In response, Mr. Raschke answered no, and testified that the level of

24   impairment at pace, concentration and persistence was too great; therefore, the hypothetical person

25   would be considered noncompetitive and unemployable. (AR 50.) Mr. Raschke also testified that

26   _____

27        [3]The DOT includes information about jobs (classified by their exertional and skill requirements)
     that exist in the national economy. 20 C.F.R. § 416.969.

28                                   Page 12 of 40

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1   the impairment precluded all work that exists regionally and nationally, and the hypothetical person

2   would not be able to meet any kind of an industrial standard in any kind of work.  (AR 58-59.)

3          Mr. Raschke testified that Plaintiff's transferable skills from her previous job as a secretary

4   were documentation, keyboarding, scheduling, numerical, and general clerical skills.  (AR 50.)

5   However, he stated that the use of hands is frequent for jobs in an office environment at the semi-

6   skilled light exertional level, and she should not be in that environment.  (AR 50-51.)  Mr. Raschke

7   testified that the only unskilled sales counter clerk job that required the occasional use of hand is a

8   Photo-Finisher, DOT 249.366-014 (level 2, light - 250 regional, 15,000 national).  (AR 52.)  He

9   also testified that a Bailiff, DOT 377.667-010 (level 3, light - 200 regional, 20,000 national) is a

10  semi-skilled occupation at the light level that requires the occasional use of the hands.  (AR 53.)

11  Mr. Raschke testified that a Bailiff would use some of Plaintiff's transferable clerical/administrative

12  skills, such as the ability to arrange schedules and to communicate effectively.  He also testified

13  that some of the Bailiff positions are law enforcement, but he did not know how many were in that

14  group.  (AR 53.)  He testified that an Information Clerk, DOT 237.367-022 (level 4, sedentary) and

15  Park Aide (level 3, light - several hundred regional, 500,000 national) are semi-skilled

16  clerical/administrative support positions that require the occasional use of hands.  (AR 54.)  Mr.

17  Raschke testified that he used 2006 census data to evaluate the number of park aide jobs, and that

18  the number may have decreased in 2009 due to budget cuts.  (AR 56-57.)  He also testified that the

19  telephone sales job was similar to Plaintiff's Avon job, and required occasional use of hands, but he

20  only had the 1990 regional and national data.  (AR 56.)

21          3.      The ALJ's Findings

22          The regulations promulgated by the Commissioner of Social Security provide for a five-step

23  sequential analysis to determine whether a Social Security claimant is disabled.[4]  20 C.F.R. §

24  404.1520(a).  The sequential inquiry is terminated when "a question is answered affirmatively or

25  _____

26      [4]Disability is "the inability to engage in any substantial gainful activity" because of a medical

27  impairment which can result in death or "which has lasted or can be expected to last for a continuous
period of not less than 12 months."  42 U.S.C. § 423(d) (1)(A).

28                                  Page 13 of 40

1   negatively in such a way that a decision can be made that a claimant is or is not disabled." *Pitzer v.*

2   *Sullivan*, 908 F.2d 502, 504 (9th Cir. 1990).  During the first four steps of this sequential inquiry,

3   the claimant bears the burden of proof to demonstrate disability.  *Valentine v. Comm'r Soc. Sec.*

4   *Admin.*, 574 F.3d 685, 689 (9th Cir. 2009).  At step five, the burden shifts to the Commissioner "to

5   show that the claimant can do other kinds of work."  *Id.* (quoting *Embrey v. Bowen*, 849 F.2d 418,

6   422 (9th Cir. 1988)).

7        The ALJ must first determine whether the claimant is performing "substantial gainful

8   activity," which would mandate that the claimant be found not disabled regardless of medical

9   condition, age, education, and work experience.  20 C.F.R. § 404.1520(a)(4)(I) and 404.1520(b).

10  Here, ALJ Parks determined that Plaintiff had not performed substantial gainful activity since

11  March 4, 2002.  (AR 20.)

12        At step two, the ALJ must determine, based on medical findings, whether the claimant has a

13  "severe" impairment or combination of impairments as defined by the Social Security Act.  If no

14  severe impairment is found, the claimant is not disabled. 20 C.F.R. § 404.1520(c).  Here, ALJ

15  Parks determined that Plaintiff had the following severe impairments: carpal tunnel syndrome and

16  tendonitis of the wrists and arms.  (AR 20.)  He determined that Plaintiff's depression was not a

17  severe impairment, finding that it "does not cause more than a minimal limitation in the claimant's

18  ability to perform basic mental work activities."  (AR 20.)

19        If the ALJ determines that the claimant has a severe impairment, the process proceeds to the

20  third step, where the ALJ must determine whether the claimant has an impairment or combination

21  of impairments which meet or equals an impairment listed in 20 C.F.R. Part 404, Subpart. P,

22  Appendix. 1.  20 C.F.R. § 404.1520(a)(4)(iii).  If a claimant's impairment either meets the listed

23  criteria for the diagnosis or is medically equivalent to the criteria of the diagnosis, he is

24  conclusively presumed to be disabled, without considering age, education and work experience.  20

25  C.F.R. § 404.1520(d).  Here, ALJ Parks determined that Plaintiff did not have any impairment or

26  combination of impairments meeting or equaling in severity any impairment set forth in the Listing

27  of Impairments.  (AR 21.)

28

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

1        Before proceeding to step four, the ALJ must determine the claimant's Residual Function

2   Capacity ("RFC").  20 C.F.R. § 404.1520(e).  RFC refers to what an individual can do in a work

3   setting, despite mental or physical limitations caused by impairments or related symptoms.  20

4   C.F.R. § 416.1545.  In assessing an individual's RFC, the ALJ must consider all of the claimant's

5   medically determinable impairments, including the medically determinable impairments that are

6   nonsevere.  20 C.F.R. § 404.1545(a)(1)-(2).  Here, ALJ Parks determined that Plaintiff has the RFC

7   to perform light work as defined in 20 C.F.R. § 404.1567(b), with occasional gross handling,

8   reaching and pulling.  (AR 21.)

9        The fourth step of the evaluation process requires that the ALJ determine whether the

10  claimant's RFC is sufficient to perform past relevant work.  20 C.F.R. § 404.1520(f).  Past relevant

11  work is work performed within the past 15 years that was substantial gainful activity, and that

12  lasted long enough for the claimant to learn to do it.  20 C.F.R. § 404.1560(b)(1).  If the claimant

13  has the RFC to do her past relevant work, the claimant is not disabled.  20 C.F.R. § 404.1520(a)(4)

14  (iv).  Here, Plaintiff has past relevant work as a secretary, but Mr. Raschke testified that she was

15  unable to perform past relevant work.  (AR 25, 51.)  Thus, based on Mr. Raschke's testimony, the

16  ALJ determined that Plaintiff was unable to perform any past relevant work.  (AR 25.)

17       In the fifth step of the analysis, the burden shifts to the Commissioner to prove that there are

18  other jobs existing in significant numbers in the national economy which the claimant can perform

19  consistent with the claimant's RFC, age, education, and work experience.  20 C.F.R. § 404.1520(g);

20  20 C.F.R. § 404.1560(c).  The Commissioner can meet this burden by relying on the testimony of a

21  vocational expert or by reference to the Medical-Vocational Guidelines at 20 C.F.R. pt. 404, subpt.

22  P, app. 2.  *Lounsburry v. Barnhart*, 468 F.3d 1111, 1114 (9th Cir. 2006).  Here, based on the

23  testimony of the vocational expert, ALJ Parks determined that, considering Plaintiff's age,

24  education, work experience, and RFC, she was capable of making a successful adjustment to other

25  work that exists in significant numbers in the national economy; therefore, Plaintiff was not

26  disabled as defined by the Social Security Act.  (AR 26.)

27       On January 25, 2010, the ALJ issued an unfavorable decision finding that Plaintiff was not

28                                    Page 15 of  40

1  disabled.  (AR 15-29.)  This decision became final when the Appeals Council declined to review it

2  on January 20, 2012.  (AR 1-4.)

3       Having exhausted her administrative remedies, Plaintiff commenced this action for judicial

4  review pursuant to 42 U.S.C. § 405(g).  On October 1, 2012, Plaintiff brought the instant motion for

5  summary judgment.  (Dkt. No. 10.)  On December 27, 2012, the Commissioner filed a cross-motion

6  for summary judgment.  (Dkt. No. 15.)

7       The Court shall address additional facts as necessary in the remainder of this Order.

8                                    **LEGAL STANDARD**

9       This Court has jurisdiction to review final decisions of the Commissioner pursuant to 42

10  U.S.C. § 405(g).  The ALJ's decision must be affirmed if the findings are "supported by substantial

11  evidence and if the [ALJ] applied the correct legal standards."  *Holohan v. Massanari*, 246 F.3d

12  1195, 1201 (9th Cir. 2001) (citation omitted).  "Substantial evidence" means more than a scintilla,

13  but less than a preponderance, of evidence which a reasonable person might accept as adequate to

14  support a conclusion.  *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002).  The court must

15  consider the administrative record as a whole, weighing the evidence that both supports and

16  detracts from the ALJ's conclusion.  *McAllister v. Sullivan*, 888 F.2d 599, 602 (9th Cir. 1989).

17  However, where the evidence is susceptible to more than one rational interpretation, the court must

18  uphold the ALJ's decision.  *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989).

19  Determinations of credibility, resolution of conflicts in medical testimony, and all other ambiguities

20  are to be resolved by the ALJ.  *Id.* at 750.  Additionally, the harmless error rule applies where

21  substantial evidence otherwise supports the ALJ's decision.  *Curry v. Sullivan*, 925 F.2d 1127, 1131

22  (9th Cir. 1990).

23                                    **DISCUSSION**

24       In her motion, Plaintiff raises three arguments in support of her position that she is entitled

25  to benefits.  First, Plaintiff argues that the ALJ failed to give appropriate weight to Dr.

26  Minkowsky's, Dr. Pon's, and Dr. Mathur's opinions.  Second, she argues that the ALJ failed to

27  properly assess her mental impairment.  Third, she argues that the ALJ erred as a matter of law in

28                                    Page 16 of  40

**United States District Court**
For the Northern District of California

1    failing to sustain the Commissioner's burden to show that there is other work in the national

2    economy that she can perform.  The Court shall consider each argument in turn.

3    **A.      Physician Opinions**

4           Plaintiff argues that the ALJ's decision is not substantially justified because the ALJ failed

5    to give appropriate weight to the opinions of Drs. Minkowsky, Pon, and Mathur.  Specifically,

6    Plaintiff argues the Dr. Minkowsky's opinion should have been given controlling weight and Drs.

7    Pon's and Mathur's opinions should not have been given significant weight.  In response, the

8    Commissioner argues that the ALJ thoroughly considered the medical opinion evidence and

9    provided good reasons for his weighing of the evidence.

10          "Cases in [the Ninth Circuit] distinguish among the opinions of three types of physicians:

11   (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the

12   claimant (examining physicians); and (3) those who neither examine nor treat the claimant

13   (nonexamining physicians)."  *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995).  Generally, an

14   opinion of a treating physician should be favored over that of a non-treating physician.  *Id.* at

15   830–31.  However, a treating physician's opinion "is not binding on an ALJ with respect to the

16   existence of an impairment or the ultimate determination of disability."  *Tonapetyan v. Halter*, 242

17   F.3d 1144, 1148 (9th Cir. 2001).  If a treating physician's opinion is uncontradicted, an ALJ must

18   give "clear and convincing" reasons that are supported by substantial evidence to reject the opinion.

19   *Lester*, 81 F.3d at 830–31.  However, if the treating physician's opinion is contradicted, an ALJ

20   needs to only give "specific and legitimate reasons that are supported by substantial evidence in the

21   record" to reject the opinion.  *Id.*  Further, the opinions of a specialist about medical issues related

22   to his or her area of specialization are given more weight than the opinions of a nonspecialist.  *See*

23   20 C.F.R. § 404.1527(d)(5) and 416.927(c)(5).  "The ALJ is responsible for determining credibility

24   and resolving conflicts or ambiguities in the medical evidence."  *Magallanes*, 881 F.2d at 750.

25          In determining what weight to give a medical opinion, the ALJ should give a treating

26   physician's opinion controlling weight if it is "well-supported by medically acceptable clinical and

27   laboratory diagnostic techniques and is not inconsistent with the other substantial evidence."

28                                    Page 17 of  40

**United States District Court**
For the Northern District of California

*Magallanes*, 881 F.2d at 751; 20 C.F.R. § 404.1527(d)(2).  As explained in Social Security Ruling 96–2p:

> [A] finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. [§] 404.1527. . . .  In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

S.S.R. 96–2p at 4 (Cum. Ed.1996), available at 61 Fed.Reg. 34,490, 34,491 (July 2, 1996). Accordingly, when an ALJ finds that a treating physician's opinion is not entitled to controlling weight, the following factors should be used to determine what weight to give that opinion: length of the treatment relationship and the frequency of examination, nature and extent of the treatment relationship, supportability, consistency, specialization, and any factors that may have bearing. 20 C.F.R. § 404.1527(d)(2)-(6); *see also Orn v. Astrue*, 495 F.3d 625, 632 (9th Cir. 2007).

  1. <u>Dr. Minkowsky's Opinion</u>

  Although the ALJ did not reject Dr. Minkowsky's opinion, he afforded his opinion "little" weight.  There appears to be no dispute that Dr. Minkowsky is Plaintiff's treating physician as he has treated her repetitive strain injury since 1997.  Dr. Minkowsky's records indicate that Plaintiff was unable to work from June 2002 until January 2004.  (AR 284, 325-26.)  In his April 1, 2003 report, Dr. Minkowsky opined that future medical treatment would only be necessary if Plaintiff experienced flare-ups of her symptoms.  (AR 236.)  If flare-ups occurred, Dr. Minkowsky stated that Plaintiff would need physical therapy, monitoring by a treating physician, and perhaps anti-inflammatory medication on an intermittent basis.  (AR 236.)  Dr. Minkowsky released Plaintiff to return to work in January 2004, and she subsequently began working for Avon.  (AR 237, 359.)

  After January 24, 2004, Dr. Minkowsky did not treat Plaintiff again until March 19, 2008. On that date, he examined Plaintiff and diagnosed repetitive strain injury, cervicothoracic strain, and dysfunction.  (AR 226.)  He also noted that Plaintiff was unable to use the computer to the extent that she was using it.  (AR 226.)  He repeated this diagnosis in a Medical Source Statement

United States District Court
For the Northern District of California

1    dated July 14, 2008, at which time he opined Plaintiff was limited to less than sedentary[5] work, with

2    no over the shoulder reaching; no lifting; no repetitive use of the mouse; writing and computer use

3    of more than two hours in an eight-hour day; no repetitive pushing or pulling; no forceful reaching,

4    pushing or pulling; no repetitive or strenuous gripping; and no heavy use of the arm even

5    occasionally.  (AR 386.)  Dr. Minkowsky also prescribed physical therapy and anti-inflammatory

6    medication.  (AR 386.)

7                 *a.    Whether Dr. Minkowsky's Opinion Should Have Controlling Weight*

8            Plaintiff contends that Dr. Minkowsky's opinion was entitled to "controlling" weight

9    because the ALJ's reasons for giving Dr. Minkowsky's opinion little weight do not constitute

10   specific and legitimate reasons.  (Pl.'s Mot. at 15.)  As stated above, a treating physician's opinion is

11   entitled to controlling weight if it is "well-supported by medically acceptable clinical and laboratory

12   diagnostic techniques and is not inconsistent with the other substantial evidence."  20 C.F.R. §

13   404.1527(d)(2).  A treating physician's opinion that is supported by acceptable clinical and

14   laboratory diagnostic techniques cannot be disregarded without contradictory medical evidence.  20

15   C.F.R. § 404.1527 (2011).  Here, the ALJ noted that Dr. Minkowsky found only slight to moderate

16   wrist and forearm pain, occasional slight right shoulder pain, moderate adverse neural tension signs

17   in the upper extremities, and negative Tinel and Phalen signs.  (AR 23.)  Based on these findings,

18   Dr. Minkowsky opined that Plaintiff was limited to less than sedentary work.  (AR 23.)  The ALJ

19   found that Dr. Minkowsky's objective findings on exam provided limited support for Plaintiff's

20   allegations of severe, persistent symptoms.  (AR 24.)  However, the ALJ did not question Dr.

21   Minkowsky's clinical and diagnostic techniques; therefore, the ALJ must provide contradictory

22   medical evidence.

23           In addition to Dr. Minkowsky's opinion, the ALJ reviewed the opinions of seven other

24   ─────────────────

25           [5]Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or
     carrying articles like docket files, ledgers, and small tools. 20 C.F.R. § 404.1567.  Although a sedentary

26   job is defined as one which involves sitting, a certain amount of walking and standing is often necessary
     in carrying out job duties. *Id.*  Jobs are sedentary if walking and standing are required occasionally and

27   other sedentary criteria are met. *Id.*

28                                        Page 19 of  40

1  physicians. (AR 22-24.) Of those seven, only Drs. Pon and Mathur opined on Plaintiff's condition

2  in 2008. (AR 388-99.) Both Drs. Pon and Mathur diagnosed Plaintiff with repetitive stress injury,

3  but opined that Plaintiff could do light work. (AR 390, 399.) Drs. Pon's and Mathur's opinions

4  contradicted Dr. Minkowsky's opinion that Plaintiff was limited to less than sedentary work and

5  disabled. (AR 22-24.) Conservative treatment is also a legitimate basis for discounting a

6  physician's opinion. *Rollins*, 261 F.3d at 856. In *Rollins*, the court noted that a conservative course

7  of treatment is not what "one would expect to accompany a finding that [a claimant] was totally

8  disabled under the Act." *Id.* Here, the record reflects that Plaintiff received only conservative

9  treatment - Plaintiff testified that she has only taken over the counter medication. (AR 24.) While

10  Plaintiff also testified that she received anti-inflammatory injections and physical therapy as well,

11  (AR 38), these are also considered conservative treatments. *See Tommasetti*, 533 F.3d at 1040.

12  Plaintiff's part-time work also contradicts Dr. Minkowsky's opinion that she was disabled. (AR

13  156.) Disability requires that the individual be unable to work. *See* 20 C.F.R. § 404.1527. Based

14  on these facts, the Court finds that Dr. Minkowsky's opinion is contradicted and not well supported.

15  Thus, the ALJ did not err when he declined to give Dr. Minkowsky's opinion controlling weight.

16                  *b.      Whether the ALJ Properly Weighed the Opinion of Dr. Minkowsky*

17          Next, Plaintiff argues that even if Dr. Minkowsky opinion is not entitled to controlling

18  weight, the ALJ erred because he failed to weigh his opinion according to the factors in 20 C.F.R. §

19  404.1527. As noted above, when a treating physician's opinion is not entitled to controlling weight,

20  the following factors should be used to determine what weight to give that opinion: length of the

21  treatment relationship and the frequency of examination, nature and extent of the treatment

22  relationship, supportability, consistency, specialization, and any factors that may have bearing. 20

23  C.F.R. § 404.1527(d)(2)-(6); *see also Orn v. Astrue*, 495 F.3d 625, 632 (9th Cir. 2007). Here, the

24  ALJ assigned Dr. Minkowsky's opinion light weight. (AR 23.) The ALJ provided three reasons for

25  his decision: 1) Dr. Minkowsky was not an orthopedic specialist; 2) Dr. Minkowsky's opinion is

26  inconsistent with his own findings on exam and conservative treatment; and 3) treatment notes from

27  July 2003 contradict his opinion and indicate that Plaintiff could occasionally lift 20 lbs. (AR 23-

28                                              Page 20 of  40

24.) Since Dr. Minkowsky's opinion is contradicted, it must only be determined whether the ALJ provided specific and legitimate reasons supported by substantial evidence in the record for giving Dr. Minkowsky's opinion light weight. *Lester*, 81 F.3d at 830–31. The ALJ can accomplish this by "setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998) (citing *Magallanes*, 881 F.2d at 751). The ALJ's reasons will be discussed in turn.

### i.    *Orthopedic Specialization*

The first reason the ALJ stated for giving Dr. Minkowsky's opinion light weight is that Dr. Minkowsky was not an orthopedic specialist. The ALJ noted that Dr. Minkowsky is a physiatrist and a physical medicine and rehabilitation doctor. (AR 23.) However, a lack of specialization is not, by itself, a reason to reject a treating doctor's opinion. *See Lester,* 81 F.3d at 833 ("The treating physician's continuing relationship with the claimant makes him especially qualified to evaluate reports from examining doctors, to integrate the medical information they provide, and to form an overall conclusion as to functional capacities and limitations, as well as to prescribe or approve the overall course of treatment."). In *Lester*, the court found that the treating physician, who specialized in treating chronic pain, provided treatment for the claimant's impairment and that his opinion constituted competent evidence, notwithstanding the fact that he was not a specialist. *Id.* Like the physician in *Lester*, Dr. Minkowsky had a continuing relationship with Plaintiff that makes him especially qualified, regardless of specialty. Further, his opinion constitutes competent evidence because he specialized in treating chronic pain. *Id.*; *see also Sprague v. Bowen*, 812 F.2d 1226, 1231 (9th Cir. 1987). Further, although the ALJ noted that Dr. Minkowsky is not an orthopedic specialists, he pointed to no evidence showing that his opinion was contradicted by an orthopedic specialist. *See Del Cielo v. Astrue*, 737 F. Supp. 2d 1271, 1277 (E.D. Wash. 2010) (ALJ correctly rejected the physician's opinion because it was contradicted by other reviewing specialist.) Thus, this Court finds that Dr. Minkowsky's lack of orthopedic specialty is not a specific and legitimate reason supported by substantial evidence in the record.

United States District Court
For the Northern District of California

1           *ii.      Consistency*

2           The second reason the ALJ stated for giving Dr. Minkowsky's opinion little weight was that

3    he found Dr. Minkowsky's opinion to be inconsistent with his own findings and conservative

4    treatment.[6]  (AR 23.)  The incongruity between a physician's statement and medical records

5    provides a specific and legitimate reason for rejecting a physician's opinion.  *Tommasetti v. Astrue*,

6    533 F. 3d 1035, 1041 (9th Cir. 2008.)  In *Tommasetti,* the treating physician completed a residual

7    functional capacity questionnaire in which she indicated the claimant could sit a maximum of four

8    hours in an eight-hour workday, stand for up to two hours, and only lift 10 pounds.  *Id.* at 1037.

9    However, the ALJ in that case found that these conclusions "did not mesh with [the doctor's]

10   objective data or history" and that the "medical records do not provide support for the limitations

11   set out in the [q]uestionnaire."  *Id.* at 1041.  As a result, the court found that the ALJ reasonably

12   rejected the treating physician's opinion.  *Id.* at 1042.

13          Here, the ALJ does not explain why Dr. Minkowsky's opinion is inconsistent with his own

14   findings or conservative medical treatment.  The ALJ must provide a specific legitimate reason by

15   setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating

16   his interpretation thereof, and making findings."  *Reddick*, 157 F.3d at 725.  This Court also notes

17   that the ALJ misstated Dr. Minkowsky's findings in his opinion as "*moderate* adverse neural

18   tension signs in the upper extremities."  (AR 23.)  As stated above, Dr. Minkowsky found Plaintiff

19   *had severe* adverse neural tension on the right and mild to moderate on the left.  (AR 226.)

20   Furthermore, consistency is determined by examining the "record as a whole" and does not require

21   similarity in findings over time despite [Plaintiff's] evolving medical status.  20 C.F.R. § 404.1527;

22   *Orn*, 495 F.3d at 634.  In *Orn*, the court found that the treating physicians' opinions were consistent

23   "with the record as a whole" because the physicians offered opinions that were substantiated by the

24   contemporaneous medical tests and the claimant's medical condition.  *Orn*, 495 F.3d at 634.  Dr.

25   Minkowsky also performed contemporaneous medical tests to substantiate his opinion.  And, while

26

27          [6]  Physical therapy and anti-inflammatory medication are conservative treatments.  *See Tommasetti*, 533 F.3d at 1040.

28                                          Page 22 of  40

1    Dr. Minkowsky's opinion may have changed from 2004 to 2008, the ALJ fails to discuss whether it

2    changed because Plaintiff's condition worsened over time. *Id.* at 635 (finding that the ALJ failed to

3    provide legitimate reasons for rejecting physician's opinion where the ALJ did not account for

4    condition worsening over time).

5          The ALJ also found Dr. Minkowsky's 2008 opinion to be inconsistent with conservative

6    treatment. (AR 23.) As previously stated, conservative treatment is a legitimate basis for

7    discounting a physician's opinion. *Rollins*, 261 F.3d at 856. The ALJ failed to explain how Dr.

8    Minkowsky's opinion is inconsistent with conservative treatment; however, Plaintiff contends that

9    there are no other treatments that can be given. (Pl.'s Mot. at 17.) In support of that contention,

10   Plaintiff cites Dr. Tse's opinion. Dr. Tse, an orthopedic specialist, opined that Plaintiff's condition

11   may not have a cure, she had to live with it, and that the areas involved remained vulnerable and

12   prone to flare-ups. (AR 254.) The ALJ gave Dr. Tse's opinion some weight. (AR 23.) As an

13   orthopedic specialist, Dr. Tse's opinion should be given more weight than the opinions of a

14   nonspecialist. *See* 20 C.F.R. § 404.1527(d)(5) and 416.927(c)(5). The ALJ's opinion does not

15   address Dr. Tse's opinion regarding available treatments for Plaintiff. Given that Dr. Tse found that

16   Plaintiff's condition is one that she "has to live with," it is not clear that anything other than

17   conservative treatment was recommended for Plaintiff. Accordingly, remand is  appropriate so that

18   the ALJ can address this issue.

19                              *iii.    July 2003 Treatment Notes*

20         The final reason the ALJ provides for giving Dr. Minkowsky's opinion little weight is that

21   his treatment notes from July 2003 contradict his opinion and indicate that Plaintiff could

22   occasionally lift 20 lbs. (AR 23.) Plaintiff argues that the ALJ mischaracterized Dr. Minkowsky's

23   treatment notes from July 2003. Specifically,  Plaintiff said that she told Dr. Minkowsky at the

24   time of the exam that the Avon job required that she occasionally lift 20 pounds, not that she could

25   actually lift 20 pounds. (AR 229.) Where the evidence is susceptible to more than one rational

26   interpretation, the Court must uphold the ALJ's decision. *Magallanes*, 881 F.2d at 750.

27   Determinations of all other ambiguities are to be resolved by the ALJ. *Id*. This Court has

28                                    Page 23 of  40

**United States District Court**
For the Northern District of California

examined the treatment note and finds that the only rational interpretation of Dr. Minkowsky's treatment note is that Plaintiff made a subjective statement that she was "interviewing for an Avon job and may occasionally lift 20 lbs." (AR 229.)  Further, Dr. Minkowsky's notes consistently mark Plaintiff's subjective comments with an "S" and his objective findings with an "O."  (AR 224-31.) As this statement is preceded by an "S," it was not rational for the ALJ to attribute it to Dr. Minkowsky as an objective finding.  Thus, the Court finds that Dr. Minkowsky's opinion treatment notes did not contradict his opinion.  Furthermore, as discussed above, while the ALJ compared Dr. Minkowsky's 2008 opinion to his 2003 treatment notes, he failed to explain why Plaintiff's condition could not have worsened over that time.  Accordingly, the Court finds that this is not a legitimate reason.

Based on this foregoing analysis, this Court finds that the ALJ did not err when he denied Dr. Minkowsky's opinion controlling weight.  However, the ALJ did not provide legitimate reasons for providing Dr. Minkowsky's opinion little weight.  Therefore, consistent with the discussion above, this case is remanded to the ALJ for further proceedings to make specific findings regarding the weight of Dr. Minkowsky's opinion.  The ALJ must set out a detailed and thorough summary of the facts and conflicting clinical evidence, state his interpretation thereof, and make findings.

2.   Dr. Pon's Opinion

Plaintiff next contends that the ALJ improperly afforded significant weight to the opinion of Dr. Pon, the examining physician.  Specifically, Plaintiff argues that the ALJ erred in giving his opinion more weight than Dr. Minkowsky's opinion because Dr. Pon did not make any independent clinical findings.[7] (Pl's Mot. at 18.)  In response, the Commissioner argues that Dr. Pon did make independent findings because he performed objective tests that are different from the tests performed by Dr. Minkowsky.  (Def.'s Mot. at 5.)

When an examining physician presents independent relevant evidence to support an

_____

[7] Independent clinical findings can be either (1) diagnoses that differ from those offered by another physician and that are supported by substantial evidence, or (2) findings based on objective medical tests that the treating physician has not herself considered. *Orn*, 495 F.3d at 632.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1 opinion, particularly medical signs and laboratory findings, his opinion is entitled to more weight.

2 20 C.F.R. § 404.1527(c)(3).  "The better an explanation a source provides for an opinion, the more

3 weight we give that opinion."  *Id.*  In *Orn*, the Ninth Circuit reiterated and expounded upon its

4 position regarding the ALJ's acceptance of the opinion of an examining physician over that of a

5 treating physician.  "When an examining physician relies on the same clinical findings as a treating

6 physician, but differs only in his of her conclusions, the conclusions of the examining physician are

7 not "'substantial evidence.'"  *Orn*, 495 F.3d at 632; *Murray v. Heckler*, 722 F.2d 499, 501-02 (9th

8 Cir. 2983).  By contrast, when an examining physician provides independent clinical findings that

9 differ from the findings of the treating physician, such findings are substantial evidence.  *Orn*, 496

10 F.3d at 632.  Independent clinical findings can be either (1) diagnoses that differ from those offered

11 by another physician and that are supported by substantial evidence, *see Allen v. Heckler*, 749 F.2d

12 577, 579 (9th Cir. 1985), or (2) findings based on objective medical tests that the treating physician

13 has not herself considered, *see Andrews*, 53 F.3d at 1041.

14         In this case, the examining physician, Dr. Pon, performed objective tests that the treating

15 doctor did not consider.  Dr. Pon noted that, on examination, Plaintiff had a full range of motion in

16 the neck and thoracic spine; normal shoulder motor capacity; normal finger strength and finger

17 movements; and normal lower extremities capabilities.  (AR 389-90.)  Dr. Pon's findings were

18 based on examinations not considered by Dr. Minkowsky.  Accordingly, if Dr. Pon's findings differ

19 from Dr. Minkowsky's, they constitute substantial evidence.  *Id.*  However, while the *Orn* Court

20 acknowledged that the ALJ may reject the treating doctor's controverted opinion if he provides

21 specific and legitimate reasons for doing so, *Orn*, 495 F.3d at 632, as discussed above, the ALJ did

22 not provide legitimate reasons for providing Dr. Minkowsky's opinion little weight.  The ALJ stated

23 that he gave significant weight to Dr. Pon's opinion because it was "consistent with the treatment

24 record and well supported."  (AR 24.)  However, given the ALJ's failure to properly determine the

25 weight given to Dr. Minkowsky's opinion, the Court is unable to determine whether the ALJ

26 properly afforded Dr. Pon's opinion significant weight.  Accordingly, remand is appropriate so that

27 the ALJ can determine the proper weight to give Dr. Pon's opinion after determining the same for

28

1    Dr. Minkowsky.

2              3.      Dr. Mathur's Opinion.

3          Lastly, Plaintiff argues that the ALJ improperly afforded significant weight to the opinion of

4    Dr. Mathur, a nonexamining physician.  (Pl.'s Mot. at 19.)  A nonexamining source has no

5    examining or treating relationship with a plaintiff; therefore, in weighing a nonexamining source's

6    opinion, an ALJ must evaluate the degree to which he provides supporting explanation, as well as

7    the degree to which he considers all of the pertinent evidence in the claim, including opinions of

8    treating and other examining sources.  20 C.F.R. § 404.1527(c)(3); *see also Dominguez v. Colvin,*

9    2013 WL 692898, at *16 (C.D. Cal. Feb. 26, 2013).

10         In his decision, the ALJ's sole comment regarding Dr. Mathur's opinion was "[t]he State

11   agency consultant opinion that the claimant can perform light work with the limitation that she

12   reach over head no more than occasionally is also afforded significant weight since it is consistent

13   with the record."  (AR 24.)  Although the ALJ gave this opinion significant weight, he failed to

14   provide any evaluation regarding Dr. Mathur's explanation for his opinion, nor did he discuss the

15   degree to which Dr. Mathur considered all of the pertinent evidence.  Further, it is not clear that Dr.

16   Mathur did, in fact, consider all of the pertinent evidence.  In *Dominguez*, the ALJ credited the

17   nonexamining physician's opinion because he "reviewed all of the medical evidence . . . before

18   rendering an opinion."  *Id.*

19         Here, it appears that Dr. Mathur opined before reviewing all of the medical evidence.  In his

20   report, Dr. Mathur indicated that he believed that Dr. Minkowsky's opinion on Plaintiff's functional

21   limitations was not consistent with objective findings because there was no explanation for the

22   postural limitations, and that a CDI study of the thoracic spine was needed to determine Plaintiff's

23   limitations.  (AR 394, 398-99.)  However, Dr. Mathur did not wait for the CDI to be completed

24   before rendering an opinion.  He also did not review the opinions of Drs. Halbrecht, Gordon or Tse.

25   In 2002, Dr. Halbrecht, an orthopedic specialist, opined that Plaintiff should restrict over the

26   shoulder reaching, lifting and repetitive mouse use.  (AR 331-32.)  In 2002, Dr. Gordon, a hand

27   specialist, opined that Plaintiff had a migratory cumulative trauma problem and that there were

28

United States District Court
For the Northern District of California

several areas of pain and discomfort in the extremities.  (AR 274.)  In 2003, Dr. Tse, an orthopedic

surgeon, diagnosed repetitive strain injury affecting Plaintiff's upper extremities, predominantly

right dominant side.  (AR 253.)  He found chronic postural cervical strain present, with mild

underlying degenerative arthropathy and disk disease of the lower cervical spine.  Dr. Tse

precluded Plaintiff from any forceful or repetitive activities, including lifting, pushing, pulling,

grasping, torquing, holding, or similar activities of comparable physical effort.  (AR 253.)  He also

precluded her from over the shoulder reaching and from repetitive motion or prolonged static

posture of the neck.  (AR 253.)  He noted that all of the affected areas remained vulnerable to flare-

ups and that there was no cure for her condition.  (AR 254.)  The ALJ's decision fails to address

these issues and the Court therefore finds remand appropriate for the ALJ to evaluate the degree to

which Dr. Mathur provides supporting explanation, as well as the degree to which he considers all

of the pertinent evidence in the claim, including opinions of treating and other examining sources.

        4.    Summary

        Based on the analysis above, the Court finds it appropriate to remand this case to the ALJ

for further proceedings.  Remand is the appropriate remedy to allow the ALJ the opportunity to

remedy the above-mentioned deficiencies and errors.  *Hunter v. Astrue*, 874 F. Supp. 2d 902, 915

(C.D. Cal. 2012).  On remand, the ALJ must fully developed the record and properly weight the

physicians' opinions.  In weighing the physician opinions, the ALJ should include a detailed and

thorough summary of the facts, conflicting evidence, his interpretation thereof, and enter a specific

finding.

**B.    Plaintiff's Depression**

        Plaintiff next contends that the ALJ erred at step two of the sequential evaluation because he

found that her depression was not a severe impairment.  Under 20 C.F.R. § 404.1520a, the ALJ is

required to follow a special psychiatric review technique when reviewing an application for

disability.  20 C.F.R. § 404.1520a.  Specifically, the ALJ must (1) determine whether an applicant

has a medically determinable mental impairment; (2) rate the degree of functional limitation for

four functional areas; (3) determine the severity of the mental impairment (in part based on the

Page 27 of  40

United States District Court
For the Northern District of California

1  degree of functional limitation); and (4) document the application of the technique.  *Id.*  The

2  physical or mental impairment must be established by medical evidence consisting of signs,

3  symptoms, and laboratory findings, not only by Plaintiff's statement of symptoms.  20 C.F.R. §

4  404.1508.

5       Here, the ALJ first determined that Plaintiff has the medically determinable mental

6  impairment of depression.  (AR 20.)  Next, the ALJ rated the degree of functional limitation caused

7  by her depression in four broad functional areas (activities of daily living; social functioning;

8  concentration, persistence, or pace; and episodes of decompensation).  (AR 20.)  Pursuant to 20

9  C.F.R. § 416.920(d)(1), if the degree of limitation in the first three functional areas is rated as

10  "none" or "mild" and the fourth area is rated as "none", the impairment is not severe.  The ALJ

11  found that Plaintiff had no more than mild limitations in activities of daily living, social functioning

12  and concentration, persistence and pace, and no episodes of decompensation; therefore, the ALJ

13  determined that her depression was not severe.  (AR 21.)

14       Plaintiff argues that the ALJ erred in reaching this conclusion for three reasons: (1) he failed

15  to consider the opinion of Dr. Les Kalman, a psychiatrist that evaluated Plaintiff in 2009; (2) he

16  failed to analyze her reasons for not obtaining mental health treatment; and (3) he ignored lay

17  witness testimony.  (Pl.'s Mot. at 20-22.)  In response, the Commissioner argues that substantial

18  evidence supports the ALJ's finding.  (Def.'s Mot. at 6.)  The Court shall consider each argument in

19  turn.

20       1.    Dr. Kalman's Opinion

21       Plaintiff argues that the ALJ failed to weigh and consider Dr. Kalman's opinion.  (Pl.'s Mot.

22  at 20.)  In response, the Commissioner argues that although Dr. Kalman diagnosed Plaintiff with

23  depression, a mere diagnosis does not equate to disability, and Dr. Kalman did not opine that

24  Plaintiff's condition had a significant impact on her ability to perform basic work activities.  (Def.'s

25  Mot. at 6-7.)  In his decision, the ALJ noted that Dr. Kalman found Plaintiff to be "alert, oriented,

26  had good insight and judgment, logical thoughts and made good eye contact, but had a depressed

27  mood and restricted affect.  Dr. Kalman noted that the claimant cooks, shops and cleans her home;

28                              Page 28 of  40

United States District Court
For the Northern District of California

1    attends to her personal hygiene, and has friends but also self isolates." (AR 24.) The ALJ also

2    noted that Dr. Kalman diagnosed Plaintiff with adjustment disorder secondary to general medical

3    condition and determined Plaintiff's GAF was 50. (AR 24.)

4           Plaintiff argues that Dr. Kalman's diagnosis and assessed GAF score of 50 proves that her

5    depression was a severe impairment. (Pl.'s Mot. at 21.) In response, the Commissioner argues that

6    the GAF scale is only intended to be used for treatment decisions and it does not have direct

7    correlation to the severity requirements in SSA disability determinations. (Def.'s Mot. at 7.) A

8    GAF score of 50 does not necessarily establish an impairment seriously interfering with the

9    claimant's ability to perform basic work activities. *Quaite v. Barnhart*, 312 F.Supp.2d 1195, 1200

10   (E.D. Mo. 2004). The GAF scale provides a measure for an individual's overall level of

11   psychological, social, and occupational functioning. Am. Psych. Ass'n., Diagnostic and Statistical

12   Manual of Mental Disorders 30 (4th ed. 1994). The scale "may be particularly useful in tracking

13   the clinical progress of individuals in global terms, using a single measure." *Id.* A GAF range of

14   41-50 reflects "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent

15   shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no

16   friends, unable to keep a job)." *Id.* at 32. As noted in the regulations, "[t]he GAF scale . . . is the

17   scale used in the multiaxial evaluation system endorsed by the American Psychiatric Association.

18   It does not have a direct correlation to the severity requirements in [SSA's] mental disorders

19   listings." Revised Criteria for Evaluating Mental Disorders and Traumatic Brain Injury, 65

20   Fed.Reg. 50746, 50764-65 (Aug. 21, 2000).

21          Thus, in evaluating the severity of Plaintiff's mental impairment, a GAF score may help

22   guide the ALJ's determination, but an ALJ is not bound to consider it. *Orellana v. Astrue*, 2008

23   WL 398834, at *9 (E.D. Cal. Feb.12, 2008) ("While a GAF score may help the ALJ assess

24   Plaintiff's ability to work, it is not essential and the ALJ's failure to rely on the GAF does not

25   constitute an improper application of the law.") Accordingly, although the ALJ did not specifically

26   address Dr. Kalman's opinion that Plaintiff's GAF was 50, the ALJ was not bound to consider it.

27   Rather, in compliance with 20 C.F.R. § 404.1520a, the ALJ reviewed the evidence, rated Plaintiff's

28                                          Page 29 of  40

United States District Court
For the Northern District of California

1    functional limitations, and concluded that Plaintiff's depression did not prevent her from performing

2    basic mental work activities.  (AR 20.)

3        Furthermore, there is nothing in Dr. Kalman's evaluation that indicates that Plaintiff could

4    not perform basic work activities.  Dr. Kalman found Plaintiff was pleasant, cooperative, alert, had

5    logical and goal-oriented thoughts, with no hallucinations or delusions, but also found that she was

6    depressed with a restricted affect and no homicidal or suicidal thoughts.  (AR 507.)  He reported

7    that Plaintiff's daily activities included cooking, shopping, and housekeeping, managing her own

8    transportation and finances, and caring for her own personal hygiene.  (AR 508.)  When examining

9    her social functioning, Dr. Kalman reported that Plaintiff got along with her family, had a couple of

10   friends, and attended bible study.  (AR 508.)  He also reported that Plaintiff worked on jigsaw

11   puzzles, managed her own finances, and drove - all activities that require concentration.  (AR 24,

12   506-08.)  Dr. Kalman did not opine that Plaintiff's condition had a significant impact on her ability

13   to perform basic work activities.  Thus, Dr. Kalman's evaluation supports the ALJ's determination

14   that Plaintiff's depression was not severe.  (AR 20-21.)

15       2.    Mental Health Treatment

16       Next, Plaintiff argues that the ALJ erred by failing to analyze her reason for not obtaining

17   treatment — she could not afford to pay for it.  (Pl.'s Mot. at 21-22.)  An "individual's statements

18   may be less credible if the level or frequency of treatment is inconsistent with the level of

19   complaints."  SSR 96-7p, available at 1996 WL 374186.  However, "the adjudicator must not draw

20   any inferences about an individual's symptoms and their functional effects from a failure to seek or

21   pursue regular medical treatment without first considering any explanations that the individual may

22   provide, or other information in the case record, that may explain infrequent or irregular medical

23   visits or failure to seek medical treatment."  *Id.*; *see also Orn*, 495 F.3d at 638 (where a claimant

24   failed to seek medical treatment and did not see any physicians because he could not afford it, that

25   would not support an adverse credibility determination).  This is particularly true with respect to

26   claims of mental impairments, as "it is a questionable practice to chastise one with a mental

27   impairment for the exercise of poor judgment in seeking rehabilitation."  *Nguyen v. Chater*, 100

28

United States District Court
For the Northern District of California

1    F.3d 1462, 1467-68 (9th Cir. 1996).

2          Here, Plaintiff testified at the hearing that she did not see a psychologist because she could

3    not afford it.  (AR 46.)  Nothing in the record suggests that the ALJ found that Plaintiff's

4    explanation for not seeing a psychologist was unreasonable; rather, the ALJ's decision focused on

5    Plaintiff's failure to seek *any* mental health treatment.  (AR 24.)  The ALJ stated that "the record has

6    no mental treatment notes."  (AR 24.)  He noted that Plaintiff "reported being depressed . . . in May

7    2003.  A month later she said she was less depressed."  (AR 24.)  Furthermore, Dr. Minkowsky

8    advised Plaintiff on May 15, 2003 to seek treatment for her depression from her primary care

9    physician, which the ALJ noted that she failed to do until "more than 5 years later," on October 29,

10   2008.  (AR 24.)  Plaintiff has not presented any evidence that she failed to seek mental health

11   treatment from her primary care physician because she could not afford it.  On the contrary,

12   physicians treated Plaintiff on several occasions during this five-year period, and she failed to

13   mention her depression to any of them.  For example, Dr. Shamash, Plaintiff's primary care

14   physician, treated her more than 18 times over this period, yet there are no notes about her

15   depression.  (AR 484-504.)  Dr. Minkowsky also treated Plaintiff on several occasions during that

16   same time period, and there were no mental health notes.  (AR 226-28, 359-60.)

17         Moreover, the ALJ looked at the record as a whole and found that, based on Plaintiff's

18   "robust level of activities, her ability to work part time in a sales position, and her lack of mental

19   health treatment and only intermittent, short term use of antidepressant medication," Plaintiff's

20   depression imposes no more than mild limitations.  (AR 24-25.)  Accordingly, even if the ALJ

21   failed to analyze her reasons for not seeking treatment, such error was harmless as the ALJ

22   considered other information in the record beyond her ability to seek treatment.[8]  Thus, based on the

23   _____

24   [8]
     Plaintiff also argues that the ALJ erred when he partially based his decision on her "short term use of
     antidepressant medication."  "Impairments that can be controlled effectively with medication are not
25   disabling for the purpose of considering eligibility for SSI benefits."  *Warre v. Comm'r of Soc. Sec.*,
     439 F.3d 1001, 1006 (9th Cir. 2006).  Here, the ALJ noted that Plaintiff was prescribed an
26   antidepressant and stopped taking it and "a year later, . . . the claimant said she was depressed and
     was given a new prescription."  (AR 24.)  Plaintiff testified that after receiving a prescription for her
27   depression from Dr. Shamash on October 29, 2008, she decided to stop taking the antidepressants in

28                                      Page 31 of  40

**United States District Court**
For the Northern District of California

1   record before it, the Court finds that the ALJ's decision is supported by substantial evidence and

2   that he applied the correct legal standards.

3           3.     <u>Lay Witness Testimony</u>

4          Finally, Plaintiff contends that the ALJ erred in rejecting a declaration by her husband, Mario

5   J. Gutierrez.  (Pl.'s Mot. at 22.)  In his declaration, Mr. Gutierrez states that Plaintiff cannot do the

6   activities she used to do because of the pain she experiences, that he and other members of her

7   family do 90% of the work around the house, and that she was depressed because of her condition.

8   (AR 512.)  The ALJ considered Mr. Gutierrez's observations, but found that he is not an acceptable

9   medical source.  (AR 24.)  Plaintiff argues that the purpose of her husband' testimony was to

10  describe what he saw on a daily basis, not to act as a medical source.  (Pl.'s Mot. at 22.)  In response,

11  the Commissioner argues that the ALJ correctly concluded that the opinions of physicians were

12  entitled to greater weight than the opinion of a lay witness.  (Def.'s Mot. at 8.)

13         "In determining whether a claimant is disabled, an ALJ must consider lay witness testimony

14  concerning a claimant's ability to work."  *Bruce v. Astrue*, 557 F.3d 1113, 1115 (9th Cir. 2009)

15  (citations and quotation marks omitted).  Ordinarily, an ALJ must provide specific reasons,

16  "germane to each witness," to reject the testimony of a lay witness.  *Id.* (citations and quotation

17  marks omitted).  If an ALJ fails to do so, "a reviewing court cannot consider the error harmless

18  unless it can confidently conclude that no reasonable ALJ, when fully crediting the testimony, could

19  have reached a different disability determination."  *Stout v. Comm'r*, 454 F.3d 1050, 1055-56 (9th

20  Cir.2006).  The Ninth Circuit has articulated three specific bases for upholding an ALJ's disability

21  determination that fails to address third-party testimony.  First, if the lay person's testimony is

22  "internally inconsistent," an ALJ can disregard it without reference.  *Lockwood v. Comm'r*, 397 F.

23

24  early 2009.  (AR 42.)  Plaintiff further testified that she started taking the antidepressants again in

25  October 2009, and the antidepressants were helping her.  (AR 43.)  These facts indicate that
    Plaintiff's depression can be controlled with medication.  Plaintiff must follow treatment prescribed

26  by her physician if this treatment can restore her ability to work, unless she has a good reason.  20
    C.F.R. § 404.1530.  Plaintiff has not asserted any reason for her decision to stop taking the

27  antidepressants.  Plaintiff's failure to assert a reason for not taking her medication therefore casts
    further doubt on the severity of her depression.  *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989).

28

App'x 288, 291 (9th Cir. 2010).  Second, if the ALJ failed to properly assign full weight to third party testimony, there is no reversible error if substantial evidence contradicts the testimony.  *Hart v. Astrue*, 349 F. App'x 175, 177 (9th Cir. 2009).  Finally, if the third party testimony does not introduce new evidence and is merely duplicative, the ALJ does not err by failing to evaluate the testimony.  *Zerba v. Comm'r of Soc. Sec. Admin.*, 279 F. App'x 438, 440 (9th Cir. 2008).

Here, the ALJ did not consider Mr. Gutierrez's testimony, stating only that he was not an acceptable medical source.  (AR 24.)  However, even if the ALJ failed to provide germane reasons, the Court finds the error harmless because the testimony is contradicted by substantial evidence.  In his declaration, Mr. Gutierrez described Plaintiff's mental symptoms as irritable, inpatient, depressed, and no longer interested in attending parties.  (AR 512.)  However, Dr. Kalman's description of Plaintiff's condition controverts this opinion.  (AR 508, 512).  Dr. Pon also controverted Mr. Gutierrez's opinion to the extent that his opinion suggests Plaintiff could not work at a regular job.  (AR 390.)  Further, Plaintiff's testimony indicated that her depression did not significantly limit her mental ability to do basic work activity.  Plaintiff testified during the hearing that she sold Avon, drove, watched movies and did bible study homework.  (AR 43.)  Mr. Gutierrez's declaration did not introduce new evidence that would change Plaintiff's disability determination.  Thus, the ALJ's error was harmless, and the ALJ's failure to address the lay testimony of Mr. Gutierrez does not require remand.

4.    Summary

Based on this analysis, the Court finds that the ALJ did not err at step two of the sequential evaluation in finding that Plaintiff's depression was not a severe impairment.

**C.    Plaintiff's Ability to Perform Jobs in the National Economy**

Plaintiff argues that the ALJ erred as a matter of law in failing to sustain Social Security's burden that there is other work in the national economy that Plaintiff can perform because (1) the ALJ's hypotheticals to the vocational expert did not include all of her limitations, (2) the ALJ did not address the conflict between the vocational expert and the DOT, and (3) the ALJ failed to follow SSR 82-41 in concluding that there were other jobs that Plaintiff could perform.  (Pl.'s Mot. at 23-

United States District Court
For the Northern District of California

27.)  In response, the Commissioner argues that the ALJ was not required to entertain all of Plaintiff's limitations, that the ALJ's failure to address the possible conflict between the vocational expert and the DOT was a harmless error, and that there is substantial evidence that supports the ALJ's determination that Plaintiff could perform alternative work.  (Def.'s Mot. at 9-10.)  The Court shall address each argument in turn.

       1.    <u>Hypotheticals Posed to the Vocational Expert</u>

Plaintiff first argues that the ALJ improperly excluded her mental limitations in determining that she has the ability to perform other work in the national economy.  (Pl.'s Mot. at 24.)  At step five, the ALJ must show that there are other jobs existing in significant numbers in the national economy which the claimant can perform consistently with the medically determinable impairments and symptoms, functional limitations, age, education, work experience and skills.  20 C.F.R. § 404.1520(a)(4)(v); 20 C.F.R. § 404.1560(c).  There are two ways to meet this burden: (1) the testimony of a vocational expert, or (2) reference to the Medical–Vocational Guidelines.  *Tackett v. Apfel*, 180 F.3d 1094, 1099 (9th Cir. 1999).  Here, the ALJ called Mr. Raschke to testify as a vocational expert at the administrative hearing.  (AR 62-66.)

"[T]he ALJ can call upon a vocational expert to testify as to: (1) what jobs the claimant, given his or her residual functional capacity, would be able to do; and (2) the availability of such jobs in the national economy."  *Tackett*, 180 F.3d at 1101.  "At the hearing, the ALJ poses hypothetical questions to the vocational expert that 'set out all of the claimant's impairments' for the vocational expert's consideration."  *Id.* (quoting *Gamer v. Secretary of Health and Human Servs.*, 825 F.2d 1275, 1279 (9th Cir. 1987)).  The vocational expert then testifies as to what kinds of jobs the claimant can perform and whether there is a sufficient number of those jobs available in the claimant's region or in several other regions of the economy to support a finding of not disabled.  *Id.* (citation omitted).

"The ALJ's depiction of the claimant's disability must be accurate, detailed, and supported by the medical record."  *Id.* (citation omitted.)  However, the ALJ need only include those impairments supported by substantial evidence.  *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 885 (9th Cir. 2006).

**United States District Court**
For the Northern District of California

1    If the ALJ does not include all claimed impairments in his hypothetical, he must make specific

2    findings explaining his rationale for disbelieving any of the claimant's subjective complaints not

3    included. *Light v. Social Sec. Admin.*, 119 F.3d 789, 793 (9th Cir. 1997). Consequently, "if the

4    assumptions in the hypothetical are not supported by the record, the opinion of the vocational expert

5    that claimant has a residual working capacity has no evidentiary value." *Gallant v. Heckler*, 753

6    F.2d 1450, 1456 (9th Cir. 1984).

7         Here, based on the testimony of the vocational expert, the ALJ concluded that Plaintiff is

8    capable of making a successful adjustment to other work that exists in significant numbers in the

9    national economy. (AR 26.) In making this determination, the ALJ posed to the vocational expert

10   two hypothetical questions — the first, based on the RFC that he assigned to Plaintiff (extertionally

11   light, for a person at Plaintiff's age based on the onset of her condition, between ages 50 and 55, that

12   could have occasional use of hands); and the second, with the same limitations but which also

13   included mental limitations (mild for activities of daily living, mild for social function, moderately

14   impaired for concentration, persistence and pace, 40-50% for detailed and complex instructions, as

15   well as 40-50% for simple and repetitive instructions and no episode of decompensation). (AR 48-

16   50.) In response, the vocational expert testified that there were unskilled jobs that existed in

17   significant numbers that a person with the RFC assigned by the ALJ could perform, but, as to the

18   second hypothetical, sufficient jobs did not exist even at the light level for a person with the

19   additional mental limitations. (AR 50.) The vocational expert testified that the level mental

20   impairment was too great; therefore, the hypothetical person would be considered noncompetitive

21   and unemployable. (AR 50.) The vocational expert also testified that the mental impairment

22   precluded all work that exists regionally and nationally, and the hypothetical person would not be

23   able to meet any kind of an industrial standard in any kind of work. (AR 58-59.) The ALJ then

24   returned to his first hypothetical, which excluded the mental impairment, and continued questioning

25   the vocational expert. (AR 50.)

26        In posing hypothetical questions to a vocational expert, a judge must include those

27   limitations supported by substantial evidence. *Robbins*, 466 F.3d at 886. An ALJ is not free to

28

disregard properly supported limitations. *Id.* Here, the Court finds that the ALJ's decision to disregard Plaintiff's alleged mental limitations is free of legal error and supported by substantial evidence in the record. In his decision, the ALJ determined that Plaintiff has the medically determinable mental impairment of depression, but found that she had no more than mild limitations in activities of daily living, social functioning and concentration, persistence and pace, and no episodes of decompensation. (AR 20-21.) Therefore, the ALJ determined that her depression was not severe. (AR 21.) As discussed above, the ALJ properly considered the evidence of record in making this determination; thus he was not required to entertain more restrictive hypothetical questions. The first hypothetical question reflected the residual functional capacity assessed by the ALJ, which was supported by substantial evidence. (AR 21, 48)

### 2.   Conflict Between the Vocational Expert and the DOT

Plaintiff  next contends that this action must be remanded because the ALJ failed to ask the VE whether his testimony was consistent with the DOT pursuant to Social Security Ruling  ("SSR") 00-4p. (Pl.'s Mot. at 25.) The Commissioner contends that the ALJ's failure to ask for potential conflicts was harmless error because substantial evidence supports the ALJ's determination. (Def.'s Mot. at 10.)

"SSR 00-4p unambiguously provides that '[w]hen a [vocational expert] . . . provides evidence about the requirements of a job or occupation, the adjudicator has an affirmative responsibility to ask about any possible conflict between that [vocational expert] . . . evidence and information provided in the [Dictionary of Occupational Titles]." *Massachi v. Astrue*, 486 F.3d 1149, 1152 (9th Cir. 2007). "SSR 00-4p further provides that the adjudicator "will ask" the vocational expert "if the evidence he or she has provided" is consistent with the Dictionary of Occupational Titles and obtain a reasonable explanation for any apparent conflict." *Id.* at 1152-53. However, the failure to ask about any possible conflict could be considered harmless if a review of the record shows that there is no conflict, or if the vocational expert had provided sufficient support for her conclusion so as to justify any potential conflicts . . . . *Id.* at 1154 fn. 19.

Here, there is no dispute that the ALJ did not ask the ALJ about potential conflicts. Thus, the

United States District Court
For the Northern District of California

1   question becomes whether this is harmless error.  Plaintiff contends that there are three conflicts in

2   the record, specifically with the Bailiff, Security Gate Guard and Photo-finisher jobs provided by the

3   vocational expert.  (Pl.'s Mot. at 25.)  The Court will consider each argument in turn.

4              *a.*      **Bailiff**

5          First, Plaintiff contends that there is a conflict between the vocational expert's testimony and

6   the DOT regarding the duties of a Bailiff.  Specifically, Plaintiff argues that the vocational expert

7   testified that there were many bailiff jobs that were not involved in law enforcement, yet he failed to

8   identify any.  (Pl.'s Mot. at 25.)  However, the vocational expert specifically referenced the job of

9   court bailiff and testified that the definition of the Bailiff job in the DOT does not require law

10  enforcement training.  (AR 53, 57.)  A review of the definition shows that this is correct.  Pursuant

11  to DOT #377.667-010, a Court Bailiff

12          Maintains order in courtroom during trial and guards jury from outside contact:
            Checks courtroom for security and cleanliness. Assures availability of sundry supplies
13          for use of JUDGE (government ser.). Enforces courtroom rules of behavior and warns
            persons not to smoke or disturb court procedure. Collects and retains unauthorized
14          firearms from persons entering courtroom. Stops people from entering courtroom
            while JUDGE (government ser.) charges jury. Provides jury escort to restaurant and
15          other areas outside of courtroom to prevent jury contact with public. Guards lodging of
            sequestered jury. Reports need for police or medical assistance to sheriff's office. May
16          advise attorneys of dress required of witnesses. May announce entrance of JUDGE
            (government ser.).
17

18  Available at 1991 WL 673189.  As this definition does not include involvement in law enforcement,

19  the Court finds that the ALJ identified a specific bailiff job; accordingly, there is no conflict.

20              *b.*      **Gate Guard**

21          Next, Plaintiff argues that the ALJ erred because he listed "security gate guard" as one of the

22  jobs that the vocational expert provided in his testimony, but the DOT code given in the decision

23  does not correspond to security gate guard.  In his testimony, the vocational expert opined that

24  Plaintiff could perform the job of "gate guard" and referenced DOT #372.667-030.  (AR 48-49.)

25  Although the ALJ referred to "security gate guard" in his decision, he provided the DOT number of

26  the gate guard position listed by the vocational expert.  Accordingly, the addition of "security" to the

27  title is harmless error.

28
                                              Page 37 of  40

United States District Court
For the Northern District of California

1

      *c.*    *Counter Clerk Photo-finisher*

2

    Finally, Plaintiff argues that the ALJ erred when he listed the job of "photo finisher" because

3   no such job exists.  (Pl.'s Mot. at 25.)  In his testimony, the vocational expert testified that Plaintiff

4   could perform the job of "photo finishing," with the DOT designation of 249.366-014.  (AR 52.)

5   However, a photo finishing job with the designation of 249.366-014 does not exist in the DOT.

6   Thus, it appears that the ALJ improperly relied on the vocational expert's testimony regarding the

7   photo-finishing job.  However, because the ALJ relied on other jobs provided by the vocational

8   expert, including gate guard, usher, court bailiff, and receptionist/information clerk, the Court finds

9   that this is harmless error.

10       3.    <u>Transferability of Skills (SSR 82-41)</u>

11     Relying on SSR 82-41, Plaintiff contends that the ALJ failed to identify specific occupations

12   to which her acquired work skills are transferable.  (Pl.'s Mot. at 26.)  SSR 82-41 states, in relevant

13   part:

14      When the issue of skills and their transferability must be decided, the . . . ALJ is
      required to make certain findings of fact and include them in the written decision.
15      Findings should be supported with appropriate documentation.

16      When a finding is made that a claimant has transferable skills, the acquired work
      skills must be identified, and specific occupations to which the acquired work skills
17      are transferable must be cited in the . . . ALJ's decision. . . .  It is important that these
      findings be made at all levels of adjudication to clearly establish the basis for the
18      determination or decision for the claimant and for a reviewing body including a
      Federal district court.

19

20   SSR 82-41, 1982 WL 31389, at *7.

21     In his decision, the ALJ relied upon the vocational expert's testimony and found that Plaintiff

22   has skills that transfer to representative occupations that require only occasional use of the hands,

23   such as bailiff, receptionist/information clerk, and park aide.  (AR 26.)  Plaintiff argues that the ALJ

24   failed to indicate which skills could transfer and to which of the occupations these skills apply.  (AR

25   26.)

26     Here, the ALJ did not identify Plaintiff's transferable skills or the specific occupations to

27   which the acquired work skills are transferable.  However, at the hearing, the ALJ asked the

28

1   vocational expert "[i]n terms of [Plaintiff's] transferable skills, what does she have as her past job as

2   secretary?" (AR 50.)  The vocational expert responded that Plaintiff had "documentation skills,

3   keyboarding skills, and . . . general clerical and administrative skills or administrative assistant

4   skills.  So numerical, certainly documentation." (AR 50.)  The ALJ then asked if there were any

5   jobs in the semi-skilled area that Plaintiff would "have transferable skills to at the light exertional

6   level." (AR 50.)  The vocational expert responded that Plaintiff could work as a bailiff, with

7   transferrable skills, including the ability "to arrange schedules, to communicate effectively, orally,

8   the things that are necessary to do those jobs." (AR 53.)  The vocational expert also testified as to

9   the park aid and receptionist/information clerk. (AR 55-56.)  Thus, even though the ALJ failed to

10  comply with SSR 82-41 by failing to make certain findings of fact and include them in the written

11  decision, the error is harmless because the vocational expert identified the acquired work skills at the

12  hearing and provided specific occupations to which the acquired work skills are transferable.

13  Although the ALJ should have included these in his decision, remand to do so is unnecessary.

14          Further, the ALJ determined that the transferability of job skills was not material to his

15  determination of disability because applying the Medical-Vocational Rules 202.14 directly supports

16  a finding of "not disabled," whether or not Plaintiff has transferable job skills. (AR 25.)  Medical

17  Vocational Rule 202.14 is applied to individuals with a light RFC, closely approaching advanced

18  age (ages 50-55), and who graduated from high school.  Transferability is not a factor under Rule

19  202.14.  20 C.F.R. § 404, Subpart P, App. 2, § 202.14.  If claimant has the ability to perform a full

20  range of light work, then the claimant is "not disabled."

21          However, the ALJ evaluated Plaintiff's disability using Plaintiff's age on the alleged disability

22  onset date in 2002, age 50.  (AR 25.)  At the time Plaintiff filed her disability claim in 2008, Plaintiff

23  was age 56.  (AR 156.)  She was age 58 years old at the time of her hearing.  The Court finds remand

24  appropriate because ALJ should have considered Plaintiff in the advanced age category for the

25  purpose of determining whether she was disabled.  *Bray*, 554 F.3d at 1229 n. 9.  At the advanced age,

26  the applicable Medical Vocational Rules are 202.06 and 202.07, and the transferability of skills is

27  dispositive.  20 C.F.R. pt. 404, subpt. P, app. 2 § 202.00(c), 202.06, and 202.07.  Therefore, the Court

28

finds remand appropriate. *Bray*, 554 F.3d at 1229 n. 9.; *Moore v. Apfel*, 216 F.3d 864, 868 (9th Cir. 2000) (noting that ALJ adjusted age category determination on remand because claimant's age had advanced); *Brouwers v. Bowen*, 823 F.2d 273, 275 (8th Cir.1987) (noting that ALJ awarded claimant disability benefits on remand, in part, because the claimant's age had advanced during the proceedings).  A claimant over the age of 55, limited to light work (as the ALJ determined Plaintiff to be), and unable to perform past relevant work qualifies as disabled unless the ALJ finds the claimant possesses skills that are "readily transferable to a significant range of semi-skilled or skilled work that is within the individual's functional capacity."  20 C.F.R. pt. 404, subpt. P, app. 2 § 202.00(c).

       4.   <u>Summary</u>

      Based on this analysis, the Court finds that (1) the ALJ properly determined that Plaintiff's depression was not severe, and he was therefore not required to entertain more restrictive hypothetical questions; (2) the ALJ's failure to ask the VE whether his testimony was consistent with the DOT pursuant to SSR 00-4p is harmless error; and (3) remand is appropriate for the ALJ to consider Plaintiff's age category under the applicable Medical Vocational Rules. *Hunter*, 874 F. Supp. 2d at 915.

<b>CONCLUSION</b>

      For the reasons stated above, this case is remanded to the Commissioner for further proceedings consistent with this opinion.

      **IT IS SO ORDERED.**

Dated: June 7, 2013

_____
MARIA-ELENA JAMES
United States Magistrate Judge

Page 40 of  40

United States District Court
For the Northern District of California